A97A0469, A97A0470. DAWSON et al. v. FULTON-DEKALB HOSPITAL AUTHORITY et al.; and vice versa.
(490 SE2d 142)

JOHNSON, Judge.

In this medical malpractice case against the Fulton-DeKalb Hospital Authority d/b/a Grady Memorial Hospital, the Georgia Medical Care Foundation ("GMCF"), and Dr. Benjamin White, Sharion Dawson contended the defendants caused the death of her ten-year-old son, Antonio Dawson. The trial court granted summary judgment to GMCF and Dr. White, and the case proceeded to trial against Grady. The jury returned a $26,700 verdict in favor of Dawson against Grady.

In Case No. A97A0469, Dawson appeals, contending the trial court erred in granting summary judgment to GMCF and Dr. White; in admitting evidence at trial tending to show she was negligent in caring for her son; and in denying her motion for new trial, made on the ground the verdict was inadequate. In its cross-appeal, Case No. A97A0470, Grady challenges the trial court's jury instructions on contributory negligence and preexisting conditions.

The evidence in the record before us shows that Antonio Dawson suffered from obstructive sleep apnea, a potentially fatal breathing disorder, caused in his case by morbid obesity and enlarged adenoids. Between April and August 1991, Antonio Dawson was referred to several Grady pediatric clinics, including the neurology clinic, the

---

ear, nose, and throat ("ENT") clinic, the nutrition clinic, and the endocrinology clinic. He was also referred to the Grady pediatric continuity clinic. The function of the continuity clinic was to provide primary care and to coordinate his overall care. Sharion Dawson did not bring her son to appointments with his primary care pediatrician on May 28, 1991; with the nutrition and ENT clinics on June 18, 1991; or with the ENT clinic on June 25, 1991. She did bring the child to several other appointments with the various clinics in the spring and summer of 1991, however, and when he was weighed at a July 11, 1991 appointment, he had lost approximately 24 pounds. After examining the child on July 25, 1991, a Grady doctor determined that the child's enlarged adenoids obstructed the child's airway and were a major contributing factor to his obstructive sleep apnea. This physician scheduled an adenoidectomy for August 14, 1991, to resolve this medical problem and improve the child's breathing.

Antonio Dawson was a Medicaid recipient, and Medicaid would not pay for the adenoidectomy without preapproval. To conduct such preapproval and precertification reviews, the Georgia Department of Medical Assistance had contracted with GMCF. Dr. White was an ENT specialist who served on a panel of physicians employed by defendant GMCF to perform preapproval reviews. In the usual course of GMCF's review process, Dr. White was provided the medical information submitted by Grady in support of its application for preapproval of Antonio Dawson's scheduled adenoidectomy, but never examined the child. Though nothing in the application submitted by Grady indicated that Antonio Dawson's tonsils were either enlarged or were contributing to the obstruction of his airway, and no such enlargement was noted by Grady physicians in either the July 25, 1991 ENT clinic examination or in the August 6 preoperation examination, Dr. White informed GMCF that if Antonio Dawson had true sleep apnea, he needed not only the adenoidectomy, but a tonsillectomy as well. Dr. White intended that GMCF would relay this information to the child's doctors and apparently believed this would be done routinely. While there is some evidence that Dr. White's opinion was passed along to Grady by telephone by the reviewing nurse at GMCF, who had no specific recollection of this case, the written notice sent to Grady by GMCF merely *disapproved* the adenoidectomy, mentioned nothing regarding Dr. White's opinion, and contained no explanation of the denial other than to say "[b]ased on the information provided it has been determined that the admission/procedure scheduled for 8-14-91 at above-mentioned hospital is not necessary at this time for the treatment of the condition identified. This decision is based on the following: INFORMATION SUBMITTED DOES NOT JUSTIFY THE REQUESTED PROCEDURE." Nothing in the record before us shows that GMCF ever notified Sha-

rion Dawson that the procedure had been denied or provided her any information regarding Dr. White's opinion.

An unidentified person on the Grady staff told Sharion Dawson by telephone on August 13, 1991, the operation had been canceled because Medicaid had refused to pay for it. Dawson understood from this conversation Grady would try again to obtain Medicaid approval. Grady eventually submitted an appeal to GMCF, but it was denied as untimely.

Antonio Dawson received no further treatment for his obstructive sleep apnea. He died in his sleep on May 15, 1992. In an autopsy, the Fulton County Medical Examiner found he weighed 148 pounds at death, and that enlargement of his adenoids as well as his tonsils partially obstructed his nasal and oral airways. The medical examiner concluded Antonio Dawson's death resulted from "cardiac dysrhythmia due to obstructive sleep apnea due to obesity and adenotonsillar hyperplasia."

Dawson's medical expert testified that an adenoidectomy would have saved Antonio Dawson's life. Grady responded by arguing that Sharion Dawson was negligent in caring for her son, and that her negligence contributed to his death. Specifically, Grady contended that between August 1991 and May 1992, Sharion Dawson did not control her son's diet. Grady also introduced evidence she sought no treatment for the child, despite urgings of his school counselor, his school social worker, and a Department of Family & Children Services worker that she seek medical care for him. Dawson contended she had taken the child to Grady in April 1992, but was unable to get anyone to see him because he did not have an appointment.

*Case No. A97A0469*

Because the trial court did not expressly direct an immediate entry of judgment under OCGA § 9-11-54 (b) as to GMCF and Dr. White, Dawson was entitled to wait until after final judgment to appeal from the summary judgment rulings. See *Culwell v. Lomas & Nettleton Co.*, 242 Ga. 242, 243 (248 SE2d 641) (1978).

1. Dawson claims it was error to grant summary judgment to GMCF and Dr. White. Though GMCF and Dr. White argued multiple grounds in support of their motion, the only reason the trial court gave for its ruling was that it found no physician-patient relationship between Dr. White and Dawson's son.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). To obtain summary judgment, a defendant need not produce any evidence, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's

claim. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant. *Rice v. Huff*, 221 Ga. App. 592, 593 (472 SE2d 140) (1996).

(a) We note in passing that the peer review immunity established by OCGA § 31-7-132 applies only to individuals, not organizations such as GMCF. For reasons discussed below, it is not necessary for us to reach the issue of whether Dr. White or any other individual associated with GMCF is entitled to this immunity in the situation before us.

(b) Dawson has not argued Dr. White was to blame for GMCF's failure to transmit his medical assessment to her son's doctors. Instead, she contends that by expressing his opinion that the tonsillectomy was needed, with the result that the procedure deemed medically necessary by her son's treating physicians at Grady was not approved, he interfered in the treatment to the extent that he created a physician-patient relationship between himself and Antonio Dawson which subjected him to an action for professional negligence. Though there is some evidence in the record to support a conclusion Dr. White's medical opinion was incorrect and may have contributed to Antonio Dawson's death by delaying or preventing appropriate treatment,[1] we are constrained to agree with the trial court that Dawson cannot establish that a physician-patient relationship was ever created between Dr. White and Antonio Dawson. Dr. White is therefore entitled to judgment as a matter of law.

This Court has held repeatedly that a doctor-patient relationship must be consensual. *Minster v. Pohl*, 206 Ga. App. 617, 619 (1) (426 SE2d 204) (1992). It is undisputed that there was never any contact between Dr. White and either Antonio or Sharion Dawson. Regardless of the opinion he offers, an anonymous physician whose involvement is limited to evaluating a proposed treatment for purposes of Medicaid coverage, who has no contact with the patient or the patient's treating physicians, does not thereby enter into a doctor-patient relationship. See *Peace v. Weisman*, 186 Ga. App. 697, 698-699 (1) (368 SE2d 319) (1988), in which there was no doctor-patient relationship even though the defendant physician actually examined the patient. The trial court therefore did not err in granting sum-

---

[1] Dawson's medical expert testified that while it is common and accepted practice to remove the adenoids whenever a tonsillectomy is performed, the converse is not true — that is, the tonsils are not always removed in conjunction with an adenoidectomy. Based on Antonio Dawson's medical records, this expert saw only the need for an adenoidectomy, not a tonsillectomy. The expert also characterized Antonio Dawson's condition as an "ENT emergency," and opined that Grady staff did not act with an appropriate "sense of urgency" in quickly obtaining an adenoidectomy or other treatment more promptly.

mary judgment to Dr. White.

(c) While summary judgment was appropriate for Dr. White, we find questions of material fact remain regarding whether GMCF is liable for its own ordinary negligence in failing to send Dawson and Grady a proper notice under 42 USC § 1320c-3 (a) (3) (A). This statute requires a peer review organization such as GMCF to send notice to a Medicaid patient and the appropriate health care provider stating that coverage for a procedure has been denied.

42 USC § 1320c-3 is part of Title XI of the Social Security Act, not Title XIX (Medicaid). However, under 42 USC § 1396a (d), which is part of Title XIX, the contract between the state Medicaid agency and a Medicaid peer review organization such as GMCF must require the peer review organization to perform activities "not inconsistent with Part B of title XI [42 USC § 1320c et seq.]" We interpret this language to incorporate the notice requirement of 42 USC § 1320c-3 (a) (3) (A) into Title XIX. GMCF contends it is not required to send notices under § 1320c-3 (a) (3) (A) because the Georgia Department of Medical Assistance has assumed this responsibility. The contract between the state and GMCF is not part of the record, however, and the other document GMCF cites for this proposition does not bear out its argument. Moreover, a state does not have the power to grant exemptions to federal law. We therefore hold GMCF has not shown it was exempt from the notice requirement and proceed to consider the proper contents of such a notice.

When peer review organizations such as GMCF make what are essentially economic judgments based upon medical opinions rendered by their agents or employees, they walk a fine line between their proper function and the unauthorized practice of medicine. For this reason, among others, implicit within the notice requirements of 42 USC § 1320c-3 (a) (3) is that the notice be truthful and complete as to the reasons a proposed course of treatment is not approved, *and*, where the disapproval is based upon a medical opinion regarding the reasonableness or necessity of the proposed treatment, the substance of that medical opinion must be communicated. Here, the treatment provider and the patient were not told that the patient's proposed course of treatment was disapproved because it should have included an additional surgical element beyond that for which payment was requested. Rather, the notice GMCF sent Grady states that the medical information they had provided the peer review organization "does not justify the requested procedure," and "the admission/procedure . . . is not necessary at this time for the treatment of the condition identified." This was not true. To the contrary, Dr. White, the physician upon whose opinion this notice was based, indicated that given the sleep apnea diagnosis and the medical information he had been provided, the patient needed *not only* the

requested procedure but a tonsillectomy as well.

It is undisputed GMCF sent Sharion Dawson no notice at all, clearly violating the statute as to her. Without such a notice, a lay consumer of medical services may be left to conclude in error that the medical problem is minor, that the proposed treatment is not necessary, and that there is no need to fight aggressively for its approval. The evidence in this case demonstrates dramatically the possible consequences of such a misunderstanding.

And though GMCF sent a notice to Grady, it was, in fact, worse than no notice at all. The false "explanation" in the Grady notice misled rather than simply failed to inform. If it had told Antonio Dawson's doctors of Dr. White's true medical assessment, the Grady physicians could have made one of two responses to address Dr. White's concern. They could have submitted information demonstrating that, contrary to Dr. White's assumption, as of August 1991 Antonio Dawson's tonsils were not enlarged and did not obstruct his oral airway, or they could have reconsidered their own opinion that a tonsillectomy was not called for in spite of these findings. However, because the only reason for the denial GMCF gave in its notice was a supposed deficiency in the documentation of the need for the adenoidectomy, Grady staff merely resubmitted the original request after adding additional notations describing Antonio Dawson's symptoms and indicating that a July 11, 1991 x-ray had shown prominent adenoids.[2]

A nurse who, as an employee of GMCF, had worked on the Dawson preapproval review had no specific recollection of Antonio Dawson's case. She testified that under her standard practice she would have received the initial approval request from Grady, called a physician reviewer (in this case, Dr. White) and read him the relevant parts of the request, summarized his response in writing on the request, and checked a box on a form that another GMCF employee would use in generating a written notice of the decision. She testified that the only choice allowed to her under GMCF's internal procedures in this type of situation was to check the box marked "5 PDNN," meaning "physician denial, not medically necessary." The nurse also testified that her standard practice was to discuss the reasons for a denial by phone with the "requesting provider." As illustrated by this case, this procedure could result in a written notice that did not even come close to reflecting accurately the true reason for a denial. Whether the nurse's testimony and the other evidence in the record show that Dr. White's opinion was or was not relayed in its

---

[2] The resubmission occurred approximately one month after the initial denial, even though the deadline for appeals was ten days from receipt of the denial. The GMCF nurse testified that 25 to 50 percent of Grady's appeals were untimely.

entirety to Antonio Dawson's doctors, or that GMCF's failure to provide a proper written notice under 42 USC § 1320c-3 (a) (3) proximately contributed to Antonio Dawson's death are questions of material fact that a jury must answer. It was therefore error to grant summary judgment to GMCF.

2. Dawson contends the trial court erred in denying her motion in limine to exclude certain testimony and documentary evidence, discussed below, that Grady contends were relevant to show Dawson's own negligence proximately contributed to her son's death. In considering these alleged errors, we bear in mind the admission of evidence is a matter largely within the discretion of the trial court. *Lewis v. Uselton*, 224 Ga. App. 428, 431 (8) (480 SE2d 856) (1997).

(a) Dawson complains of the admission of evidence that she moved sometime in 1991 and did not give Grady her new address or telephone number. Grady claims this evidence was relevant because a nurse in the continuity clinic tried to contact Dawson in September 1991 to reschedule a missed appointment, and if she had been able to do so, it is likely the surgery would have been rescheduled and performed.

We find no abuse of discretion in the admission of this evidence. "The Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value. Evidence of doubtful relevancy or competency should be admitted and its weight left to the jurors." (Citation and punctuation omitted.) *First Union Nat. Bank &c. v. Cook*, 223 Ga. App. 374, 380-381 (11) (477 SE2d 649) (1996). Dawson's argument that valid phone numbers for two family contacts were always in her son's file goes to the weight of the evidence, not its admissibility.

(b) Dawson argues it was irrelevant she did not bring the child to four Grady clinic appointments on three days in May and June 1991. She contends because these missed appointments were *before* the scheduled surgery date of August 14, and because she brought him to several other appointments during that spring and summer, the missed appointments are not probative of whether she committed later negligence contributing to the child's death.

Dawson's argument is correct. Because the evidence did not show she had a "fixed and uniform habit" of negligently caring for her son, evidence of the missed May and June 1991 appointments was not probative of whether she negligently cared for him after the surgery was canceled in August. See generally *Leo v. Williams*, 207 Ga. App. 321, 323 (428 SE2d 108) (1993). "As a general rule in negligence actions, evidence of similar acts or omissions is not admissible." *Goss v. Total Chipping*, 220 Ga. App. 643, 644 (2) (a) (469 SE2d 855) (1996); see generally OCGA § 24-2-2. Exceptions discussed in *Gunthorpe v. Daniels*, 150 Ga. App. 113 (257 SE2d 199) (1979), do not

apply here.[3] Furthermore, Dawson's medical expert testified that the Grady physicians did not react to Antonio Dawson's condition with suitable urgency, so it is unsurprising that Dawson did not gain from them an understanding of the importance of diligently attending to her son's condition. Admitting this evidence was error.

A showing of mere error is not enough to obtain a reversal, however. Harm must be shown as well. *Theatre of the Stars v. Atlanta Woman's Club*, 184 Ga. App. 810, 814 (4) (363 SE2d 6) (1987); see generally OCGA § 9-11-61. The test for whether an evidentiary error is harmful is whether it affected the verdict. See *Collins v. Davis*, 186 Ga. App. 192, 195 (1) (366 SE2d 769) (1988). We have found no Georgia decisions addressing the harmless error question in a comparative negligence case, in which the jury is asked to determine not merely whether the plaintiff was negligent, but the degree to which any negligence of the plaintiff contributed to her injury. Decisions from other jurisdictions, however, agree that when evidence which the jury might view as bearing on a party's negligence is improperly admitted or excluded, the error "could impact the percentage of comparative negligence" and therefore mandates reversal. *Magliocco v. American Locker Co.*, 239 Cal. Rptr. 497, 503 (Cal. App. 1987); see also *Boles v. Brackin*, 411 S2d 280, 282 (Fla. App. 1982), rev'd on other grounds, 452 S2d 540 (1984), and *Auseth v. Farmers &c. Ins. Co.*, 99 NW2d 700, 702 (Wis. 1959). We agree with this reasoning and have found no cases to the contrary. We therefore hold the trial court erred in denying Dawson's motion for new trial.

Because the evidentiary issue is dispositive, we need not reach Dawson's allegation the trial court erred in failing to set aside the verdict as inadequate. We address below the issues raised by Grady in its cross-appeal, as they are likely to arise again on retrial.

*Case No. A97A0470*

3. Grady contends the trial judge erred by charging the jury Dawson could "be contributorily negligent only if she had knowledge or reasonable notice of the danger to be avoided. A plaintiff parent who does not have such knowledge or notice is not contributorily negligent." Grady claims this instruction confused the principles of contributory negligence, which was an issue in the case, and assumption of the risk, which was not. If this charge is given on retrial, Grady

---

[3] Evidence of other specific instances of negligence may be admitted to rebut a contention it was impossible for an accident to happen in the manner claimed, or to show causation, the prior existence of a dangerous condition or hazardous situation, knowledge of a defect, or a degree of wilfulness or wantonness sufficient to justify punitive damages. *Gunthorpe*, supra at 113-116 (1), (2), (3). This list may not be exhaustive. Id. at 114 (1).

argues, it may lead the jury mistakenly to believe they may not hold Dawson's negligence against her unless her conduct was so culpable as to meet the higher standard for assumption of the risk.

The foundation of Grady's argument is that assumption of the risk is a *knowing* choice of or acquiescence in a course of action that runs a known risk, while contributory negligence is merely unreasonable conduct, which may include failure to take reasonable care to *discover unknown* dangers. In a contributory negligence case, "[t]he question is not what the defendant in fact comprehended but what should have in the exercise of ordinary care been comprehended." (Emphasis omitted.) *Nathan v. Oakland Park Supermarket*, 126 Ga. App. 538, 540 (2) (191 SE2d 327) (1972). Compare *Vaughn v. Pleasant*, 266 Ga. 862, 864-865 (1) (471 SE2d 866) (1996).

While we generally agree with Grady's characterization of the two defenses, we do not agree the challenged charge was so confusing as to constitute reversible error. The trial court's use of the phrase "knowledge *or* reasonable notice" would tell a reasonable jury it could find Sharion Dawson contributorily negligent if the facts were sufficient to put a reasonable person on notice of the danger to Antonio Dawson, even if Sharion Dawson was not herself conscious of that danger. Moreover, the trial court gave a fuller instruction on contributory negligence, which Grady does not challenge, immediately afterward. "[V]iewing the charge as a whole, as we must, we cannot say that it misstated the law or was confusing to the jury." (Citation and punctuation omitted.) *Fouts v. Builders Transport*, 222 Ga. App. 568, 574 (4) (474 SE2d 746) (1996).

4. Grady contends the following charge was erroneous for two reasons: "The defendants in this case took Antonio Dawson as they found him. That is, the fact that he may have had certain preexisting conditions or disabilities, which combined with the negligent acts, if any, of the defendants caused his death, would not absolve the defendants of liability if you should find that the defendants were negligent, and that such negligence was a contributing factor to his death."

(a) Grady argues Antonio Dawson had no preexisting condition, because at the time the surgery was canceled he had lost a significant amount of weight and his tonsils were not enlarged. The record shows, however, that at his lightest the child was well over double his target weight, and Grady has pointed to no evidence the swelling of his adenoids ever subsided. As mentioned above, Dawson's medical expert said the obesity and adenoidal enlargement combined to create an "ENT emergency." Grady's argument is therefore without merit. See generally *Madden v. Solomon*, 196 Ga. App. 512, 513-514 (3) (396 SE2d 245) (1990).

(b) Grady claims the charge on preexisting conditions was

improper because the jury was not "properly qualified on what a preexisting condition was," and was not instructed that it must decide whether a preexisting condition was present before deciding whether Grady's conduct aggravated it. Given the plain evidence and obvious issues in the case, we do not find the challenged charge to be confusing or a misstatement of the law. See generally *Fouts*, supra.

*Judgment affirmed in Case No. A97A0470. Judgment affirmed in part and reversed in part in Case No. A97A0469. Pope, P. J., and Blackburn, J., concur.*

DECIDED JULY 16, 1997 —
RECONSIDERATIONS DENIED JULY 29, 1997 — ▮▮▮▮▮▮▮▮

*Toliver & King, Alvin L. Toliver, Joseph H. King, Jr., James A. Shea, Jr.*, for appellants.

*Alston & Bird, James C. Grant, Robert D. McCallum, Jr., Candace N. Smith*, for appellees.