**FIFTH DIVISION
MCFADDEN, P. J.,
RAY and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 10, 2018**

# In the Court of Appeals of Georgia

A18A1360. PHAM v. BLACK.

A18A1361. BLACK v. TRINH et al.

RICKMAN, Judge.

Following the death of Jonathan Black ("the decedent"), his sister and administratrix of his estate, Nicolette Black, sued Drs. Hai Hong Trinh, James S. Abraham, Lily Lan-Nhu Huyen Pham, Newton Medical Center ("NMC"), and others, alleging, inter alia, that the individual doctors committed medical malpractice in their treatment of the decedent and violated their legal duty under the Federal Emergency Medical Treatment and Active Labor Act ("EMTALA") 42 USC § 1395dd by, inter alia, failing to stabilize the decedent prior to transferring him to another hospital.[1]

---

[1] This is the second appearance of this case before this Court. In *Abraham v. Black*, ___ Ga. App. ___ (816 SE2d 351) (2018) (physical precedent only), we concluded that the state court had jurisdiction to determine that Black was the proper

Pham filed a motion for summary judgment alleging that Black's claims against her must fail because she and the decedent did not have a doctor-patient relationship. Additionally, the doctors filed motions to dismiss Black's claim of violation of a legal duty because EMTALA imposes a legal duty only upon hospitals, not individual doctors. Following a hearing, the trial court denied Pham's motion for summary judgment but granted the motions to dismiss Black's claim of violation of a legal duty.

On appeal in A18A1360, Pham contends that the trial court erred by denying her motion for summary judgment because she had no doctor-patient relationship with the decedent. In A18A1361, Black contends that the trial court erred in dismissing her claim of violation of a legal duty. For the following reasons, we reverse the trial court's denial of Pham's motion for summary judgment and we affirm the trial court's grant of the doctors' motion to dismiss.

> We apply a de novo standard of review to an appeal from a grant of summary judgment and view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. A defendant may obtain summary judgment by showing

party to bring this lawsuit.

2

an absence of evidence supporting at least one essential element of the plaintiff's claim.

(Citation and punctuation omitted.) *Donastorg v. Rainbow USA, Inc.*, 342 Ga. App. 215, 215-216 (802 SE2d 425) (2017)

So viewed, the record shows that on February 19, 2013, the 23-year-old decedent arrived at the NMC emergency department by ambulance complaining of a racing heart rate. On that evening, Pham was the only night-shift hospitalist on duty, and her responsibilities included admitting patients to NMC and taking care of emergent issues that developed with any patients who had already been admitted. Pham had the ability to admit patients from the emergency department.

Trinh, the emergency department doctor who treated the decedent, paged Pham, described the decedent's symptoms, and informed her that he had spoken with Abraham, the on-call cardiologist. Pham told Trinh that she was reluctant to admit the decedent until his heart rate could be lowered. Pham exchanged text messages with Abraham about the decedent's condition, and Abraham recommended that the decedent be placed in the ICU, Pham replied that she was concerned about the decedent staying at NMC because of his symptoms at his young age. Trinh diagnosed

the decedent as suffering from a thyroid storm. Trinh had never previously treated a patient with a thyroid storm.

In a second conversation, Trinh informed Pham about the thyroid storm and advised her that Abraham recommended the decedent be admitted to the ICU. This conservation was cut short when the decedent "coded." Pham then had a third conversation with Trinh during which Trinh advised her that the decedent had "coded" and was on life support. Pham suggested that Trinh inform Abraham about the decedent's change in condition. Pham decided that the decedent should not be admitted to NMC. Abraham told Trinh that he decided to transfer the decedent to Emory University Hospital so that he could receive a higher level of care. Trinh signed the transport form which indicates that the transfer was due to "lack of needed services." While the decedent was treated at NMC, Pham never saw him.

The decedent was transported via helicopter to Emory and "coded" during the flight. The following morning, Pham sent a text message to Abraham inquiring if he had heard anything about the decedent's condition. Abraham responded that the decedent was, "[a]live but very sick . . . I guess you [have] learned not to trust that idiot [Trinh]." Pham replied, "Most definitely. Trinh is a moron and an

4

embarrassment to my race." Once at Emory, the decedent was stabilized, however he died the next day.

*A18A1360*

1. Pham contends that the trial court erred in denying her motion for summary judgment because she had no doctor-patient relationship with the decedent. We agree.

> It is well settled Georgia law that proof of three essential elements is required to establish liability in a medical malpractice action: (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained.

(Citation and punctuation omitted.) *Tomeh v. Bohannon*, 329 Ga. App. 596, 598 (765 SE2d 743) (2014). See OCGA § 51-1-27. "[T]here can be no liability for malpractice in the absence of a physician-patient relationship. Doctor-patient privity is essential because it is this relationship which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct." (Citation and punctuation omitted.) *Anderson v. Houser*, 240 Ga. App. 613, 615 (1) (523 SE2d 342) (1999). "The relationship is considered consensual where the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient." (Citation and punctuation omitted.) Id.

5

"Although a doctor who has agreed to be on-call makes himself available to be consulted regarding a patient's condition, that fact alone does not indicate that the doctor has agreed to establish a doctor-patient relationship with any patient who presents herself to the hospital for diagnosis and treatment." *Anderson*, 240 Ga. App. at 619 (1). "Indeed, there may be many circumstances where an on-call physician who is consulted about a particular patient does not feel competent to diagnose and treat the patient." Id. "Clearly, in those circumstances, the mere fact that the doctor has agreed to be on call for consultation does not establish a consensual doctor-patient relationship." Id. "A plaintiff has to show more than that a doctor was the on-call physician at the time of the patient's injury. Georgia law requires some evidence of an actual doctor-patient relationship." *Tomeh*, 329 Ga. App. at 601 (b).

Here, Pham was the hospitalist on duty at the time the decedent was being treated at NMC and was called for consultation by Trinh and Abraham. Pham never met the decedent and did not participate in his diagnosis or his treatment. Additionally, Pham deposed that she had never treated anyone with a thyroid storm, and while she was familiar with the medications required to treat a thyroid storm, she did not know when the medication should be administered. Pham believed that NMC did not have the capacity to treat a patient suffering from a thyroid storm because

6

there was not an endocrinologist on staff. Abraham arranged the decedent's transfer to Emory and Trinh signed the transfer document.

Under these facts and circumstances where Pham's sole involvement with the decedent was consulting with his treating doctors regarding whether he should be admitted to NMC and ultimately refusing to admit him, we do not find that Pham and the decedent had an actual doctor-patient relationship. See *Tomeh*, 329 Ga. App. at 600-601 (b) (holding that there was no doctor-patient relationship where pediatrician who was on call during baby's birth did not diagnose or treat the baby); see also *Anderson*, 240 Ga. App. at 620-621 (1) (finding that the on-call doctor who did not diagnose or treat patient was not in privity with patient); *Minster v. Pohl*, 206 Ga. App. 617, 620 (1) (426 SE2d 204) (1992) (where the trial court properly granted summary judgment in favor of the emergency room doctor on duty because "[a]lthough [the doctor] unquestionably took action with respect to the decedent, viewing the x-ray and making a notation on her chart, nothing in the record justifies the inference that Pohl was acting as *her* doctor.") (emphasis in original). Accordingly, the trial court erred in denying Pham's motion for summary judgment.

2. Black contends that the trial court erred in dismissing her violation of a legal duty claim because EMTALA imposes a legal duty on the individual doctors but does not provide a cause of action and, thus, the claim was properly brought pursuant to OCGA § 51-1-6.

"This appeal presents a question of law, which we review de novo." (Citation and punctuation omitted.) *Atlanta Women's Health Group, P. C. v. Clemons*, 299 Ga. App. 102 (681 SE2d 754) (2009).

"EMTALA . . . was intended to prevent "patient dumping," the practice of some hospital emergency rooms turning away or transferring indigents to public hospitals without prior assessment or stabilization treatment." *Harry v. Marchant*, 291 F3d 767, 772 (III) (B) (11th Cir. 2002). EMTALA imposes certain requirements on hospitals with emergency departments, including "if any individual . . .comes to the emergency department and a request is made . . .for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition. . . exists." 42 USC § 1395dd (a). Should the hospital determine that the individual is suffering from an

emergency medical condition, EMTALA imposes an additional duty upon the hospital to "stabilize the medical condition" or "transfer of the individual to another medical facility." 42 USC § 1395dd (b) (1) "The term 'to stabilize' means . . . to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 USC § 1395dd (e) (3) (A). "The term 'transfer' means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by . . . the hospital[.]" 42 USC § 1395dd (e) (4).

The hospital may not transfer an individual whose emergency condition has not been stabilized absent certain defined exceptions. See 42 USC § 1395dd (c) (1). "The term 'stabilized' means, with respect to an emergency medical condition . . . that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility[.]" 42 USC § 1395dd (e) (3) (B). "Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of [EMTALA] may, in a civil action against the participating hospital, obtain those

9

damages available for personal injury under [Georgia law] . . ." 42 USC § 1395dd (d) (2) (A).

Because EMTALA only provides relief in a personal injury action against the participating hospital, Black brought this action under OCGA § 51-1-6 which provides that "[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." "By its express terms, tort liability under OCGA § 51-1-6 mandates that the alleged tortfeasors have breached a legal duty to perform a beneficial act or to refrain from doing an injurious act." *Wells Fargo Bank, N. A. v. Jenkins*, 293 Ga. 162, 164 (744 SE2d 686) (2013).

However, EMTALA only imposes a legal duty upon hospitals, not individual doctors. The legal duty to perform the medical screening, stabilize the patient, and restrict transfers until the patient is stabilized fell upon the hospital by the plain language of the statute. See 42 USC § 1395dd; see also *Roberts v. Galen of Virginia*, 525 U. S. 249, 250 (119 SCt 685, 142 LE2d 648) (1999) (EMTALA "places obligations of screening and stabilization upon hospitals and emergency rooms"); *Quinney v. Phoebe Putney Memorial Hosp.*, 325 Ga. App. 112, 121 (3) (751 SE2d

10

874) (2013) (EMTALA imposes legal duties upon hospitals). Because EMTALA imposes no legal duty on individual doctors, Black cannot maintain a cause of action against the individual doctors under OCGA § 51-1-6 and, thus, the trial court properly granted the doctors' motions to dismiss her violation of a legal duty claim. See *Wells Fargo Bank*, 293 Ga. at 164-165; see also *Best Jewelry Manufacturing Co. v. Reed Elsevier Inc.,* 334 Ga. App. 826, 833-834 (1) (b) (780 SE2d 689) (2015); *U. S. Bank, N. A. v. Phillips*, 318 Ga. App. 819, 825-826 (3) (734 SE2d 799) (2012).

*Judgment affirmed in part; reversed in part. McFadden, P. J., concurs in Division 2 and dissents in Division 1. Ray, J., concurs.*\*

**\*DIVISION 1 OF THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2(a).**

11

# In the Court of Appeals of Georgia

A18A1360. PHAM v. BLACK.

A18A1361. BLACK v. TRINH et al.

McFADDEN, Presiding Judge, concurring in part and dissenting in part.

I concur in Division 2 of the majority opinion, affirming the dismissal of Black's claim under EMTALA. I disagree, however, with the majority's conclusion that, as a matter of law, no doctor-patient relationship existed between Pham and the decedent, so I respectfully dissent to Division 1.

As the majority points out, "the mere fact that [a] doctor has agreed to be on call for consultation does not establish a consensual doctor-patient relationship." *Anderson v. Houser*, 240 Ga. App. 613, 615 (1) (523 SE2d 342) (1999), Instead, the on-call doctor must have "done something, such as participate in the patient's diagnosis and treatment, that supports the implication that she consented to a physician-patient relationship." Id. The record in this case contains evidence that Pham did something that supported such an implication — as she acknowledges, Pham made a medical decision regarding the decedent's care by determining that he should not be admitted to Newton Medical Center. Viewing this evidence most favorably to Black, as we must, "there is an issue of fact regarding an implied physician-patient relationship" that precludes summary judgment to Pham. *Rindsberg v. Neacsu*, 317 Ga. App. 269, 273 (730 SE2d 525) (2012). So I would affirm the trial court's denial of Pham's summary judgment motion.

I note that, given Pham's limited role as a hospitalist, any duty Pham would owe an emergency room patient to whom she merely denied admission would be limited in scope. It is not apparent to me from the record that Black will be able to point to evidence creating genuine issues of material fact regarding Pham's alleged breach of that limited duty and whether any such breach proximately caused the

2

decedent's death. But this is a different ground than the ground advanced by Pham in support of her motion for summary judgment, and the trial court did not rule upon this ground. "Although this court can sometimes review a summary judgment ruling to determine if it was right for some reason other than that given by the court below, this court cannot also consider whether the trial court was wrong for any reason." *HA&W Capital Partners, LLC v. Bhandari*, 346 Ga. App. 598, 607 (2) (b) (816 SE2d 804) (2018) (citation and punctuation omitted).